IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KENNETH L. SPURLOCK,       )
                           )
            Plaintiff,     )
                           )
      v.                   )    Case No.
                           )    10-3209-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,        )
                           )
            Defendant.     )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kenneth Spurlock seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred (1) in failing to give proper weight to plaintiff's treating doctors and psychologists in assessing plaintiff's physical and mental impairments, and (2) in deriving a residual functional capacity that does not properly take into account all of the evidence. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On May 5, 2005, plaintiff applied for disability benefits alleging that he had been disabled since March 27, 2005, amended

from September 1, 2004. Plaintiff's disability stems from back pain, headaches, and depression. Plaintiff's application was denied on July 1, 2005. On April 15, 2008, a hearing was held before an Administrative Law Judge. On May 27, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 15, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any
other work?

                    Yes = disabled.
                    No = not disabled.

## IV.   THE RECORD

        The record consists of the testimony of plaintiff, medical

expert John Morse, and vocational expert Nelly Katsell, in

addition to documentary evidence admitted at the hearing and

before the Appeals Council.

## A.   EARNINGS RECORD

        The record establishes that plaintiff earned the following

income from 1986 through 2008:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1986 | $     36.84 | 1998 | $    901.50 |
| 1987 | 2,983.06 | 1999 | 1,198.88 |
| 1988 | 3,280.78 | 2000 | 9,866.12 |
| 1989 | 5,732.26 | 2001 | 16,337.26 |
| 1990 | 1,880.25 | 2002 | 21,599.00 |
| 1991 | 16,424.79 | 2003 | 22,584.80 |
| 1992 | 16,943.47 | 2004 | 16,055.32 |
| 1993 | 3,849.63 | 2005 | 1,556.80 |
| 1994 | 668.00 | 2006 | 0.00 |
| 1995 | 4,848.27 | 2007 | 0.00 |
| 1996 | 8,081.01 | 2008 | 0.00 |
| 1997 | 4,743.18 | | |

(Tr. at 35, 38).

### B.   SUMMARY OF MEDICAL RECORDS

On November 13, 1992, plaintiff went to the emergency room after he fell while working on a construction site, injuring his right hip and the left side of his face (Tr. at 219). Plaintiff "was thought to be knocked out for a minute or two however was up out of the basement and sitting in a truck by the time the paramedics arrived." X-rays of plaintiff's right ribs were normal. The treating physician assessed a closed head trauma, a fractured lateral wall of the maxillary sinus, and a probable orbital floor (eye socket) fracture.

On April 8, 1993, Gregory Pucci, M.D., wrote a letter to plaintiff's worker's compensation attorney after having examined plaintiff at the attorney's request (Tr. at 216-217). Dr. Pucci mistakenly noted injuries to the right side of plaintiff's face, although the records he said he reviewed indicated injuries to the left side of the face. Plaintiff complained of pain and tenderness of the "right" eye, a feeling of numbness of the right side of the face, intermittent dizziness mainly on changing positions, and intermittent pain and discomfort in his lower back. Plaintiff no longer complained of ringing in the ears or memory loss. Plaintiff's exam was normal except for mild to moderate tenderness around the eye socket.

"This patient has no objective neurologic deficit detectable. . . . He does, in my opinion, have a flattened affect and diminished attention span which are compatible with a diagnosis of post-concussion syndrome, mild in degree." Dr. Pucci assessed a "permanent partial disability of 10% to 15% of the body as a whole" and recommended that plaintiff not work in the construction industry.

A little over two years later, on May 5, 2005, plaintiff applied for Social Security disability benefits alleging disability since September 4, 2004. There are no medical records for the year 2004. Plaintiff's alleged onset date was amended at the hearing to March 27, 2005; however, there are no treatment records in 2005 prior to June 25 of that year when plaintiff first started seeing James Gracheck, D.O.

On June 3, 2005, Holly Chatain, Psy.D., a licensed psychologist at Allied Mental Health Associates, Inc., evaluated plaintiff at the request of the Vernon County Family Support Division to help determine his eligibility for medical assistance (Tr. at 99-101). Plaintiff reported that he was not taking any medications at the time. He said he had had some depression "for years" but his self-esteem was good, he had no history of suicide or homicide attempts, no past psychological treatment, no history of hallucinations or delusions, no history of mania or hypomania,

no appetite disturbance. "He identified inadequate finances and being unemployed as current stressors." Plaintiff was living with his mother.

Plaintiff's appearance was not unusual in any manner, he was oriented times four, had appropriate eye contact, he was cooperative and completed all tasks. Dr. Chatain noted that plaintiff's mood was somewhat depressed and his affect was blunted, but his memory functioning was intact, he exhibited no unusual behaviors, and he appeared to comprehend was was said to him during the examination. She indicated that plaintiff's test results were probably an exaggerated, distorted overstatement of his symptoms, and thus might be invalid. Dr. Chatain noted plaintiff's psychological functioning was impaired by mild chronic depression. She assessed dysthymic disorder,[1] assigned a GAF of 60,[2] and recommended that plaintiff be referred for outpatient psychological treatment.

On June 16, 2005, plaintiff was seen by S. Subramanian, M.D., at the request of Disability Determinations (Tr. at 101-05). Plaintiff's chief complaint was chronic back pain. "He had

_____

[1]Chronic depression, not as severe as major depression, with the main symptom being sadness.

[2]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

major surgery[3] at that time for broken bones in the skull area."
Plaintiff was taking no medications.  Dr. Subramanian's
examination revealed fairly well-preserved range of motion in all
of the joints.  Plaintiff had slightly decreased rotation in his
cervical spine and flexion in his lumbar spine, but otherwise
normal range of motion in his cervical and lumbar spine.
Plaintiff's vision (with glasses) and hearing were normal.
Plaintiff's motor sensory functions were preserved, his cranial
nerves intact, and his gait was normal without the need for an
assistive device.  Plaintiff's grip strength and upper and lower
arm strength were normal.  His straight leg raising test[4] was
negative.  Dr. Subramanian assessed back pain, possibly secondary
to lumbosacral disc disease, and mild reflux disease.  Dr.
Subramanian noted that plaintiff did not have any issues with
sitting, standing, handling objects, hearing, speaking, or
traveling, but noted that he might have some limitations in
lifting, carrying, and walking long distances due to back pain.

On June 30, 2005, Lester Bland, Psy.D., completed a
Psychiatric Review Technique (Tr. at 106-199).  Dr. Bland found

---

[3]There are no records of this major surgery in the
administrative transcript.

[4]The straight leg raising test is a neurodynamic test often
used to test for disc herniation or other back problems. See
David J. Magee, Orthopedic Physical Assessment 558 (5th ed.
2008).

that plaintiff's mental impairment (caused by dysthymic disorder) was not severe. He found that plaintiff had mild restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Bland wrote, "This 37 year old claimant alleges disability due to back pain and headaches. DFS sent him to an exam. He was diagnosed with Dysthymic Disorder. He has sought no treatment. He has not been hospitalized and he lives with his mom and appears to do well with most daily activities. There is no evidence of a severe mental impairment which would affect his ability to work.

From June 2005 through March 2008, plaintiff saw James E. Gracheck, D.O., as his primary care physician (Tr. at 121-123, 191-192, 234-235, 237-238). Most of Dr. Gracheck's records are illegible. Treatment notes from plaintiff's initial visit on June 21, 2005, state "p[atient] to get [illegible] when he qualifies for disability." Dr. Gracheck noted plaintiff's complaint of chronic back pain since his fall in 1992 and also mentioned multiple lipomas[5] around his back. On that first

---

[5]"A lipoma is a slow-growing, fatty lump that's most often situated between your skin and the underlying muscle layer. Often a lipoma is easy to identify because it moves readily with slight finger pressure. It's doughy to touch and usually not tender. You may have more than one lipoma. Lipomas can occur at any age, but they're most often detected during middle age. A

visit, Dr. Gracheck wrote:

> Chronic back pain secondary to fall resulted in fractured skull, *[illegible]*
> musculoskeletal *[illegible]* chronic pain and *[illegible]*.
> Multiple lypomas *[sic]* around back *[illegible]*
> P to get *[illegible]* when he qualifies for disability
> Feldene[6] *[illegible dose]*
> Hydrocodone[7] *[illegible dose]*
> Amitriptyline[8] *[illegible dose]*

That is the entire medical record (Tr. at 123).

On November 7, 2005, Dr. Gracheck wrote:

> Feel like cannot get deep breath
> Lung CTA *[clear to auscultation]*
> *[illegible]*
> Hydrocodone *[illegible dose]*
> Amitriptyline *[illegible dose]*

This is the entire medical record (Tr. at 123).

X-rays of plaintiff's lumbar spine taken in mid-December 2005 revealed mild degenerative spondylosis[9] (Tr. at 205). They otherwise showed no abnormality.

---

lipoma isn't cancer and is usually harmless. Treatment generally isn't necessary, but if the lipoma is in a location that bothers you, is painful or is growing, you may want to have it removed." http://www.mayoclinic.com/health/lipoma/DS00634

[6]Non-steroidal anti-inflammatory

[7]Narcotic pain reliever

[8]Antidepressant

[9]Spondylosis is caused by chronic wearing away (degeneration) of the spine, including the cushions between the vertebrae (disks) and the joints between the bones of the spine. There may be abnormal growths or "spurs" on the bones of the spine (vertebrae).

On January 12, 2006, Dr. Gracheck wrote:

> Chronic back pain secondary to *[illegible]*.
> Chronic *[illegible]* pain.
> Will try to get disability.
> Hydrocodone 10/650 100

That is the entire medical record (Tr. at 122).

On February 6, 2006, Dr. Gracheck wrote:

> Multiple lypomas *[sic]* back
> Chronic back pain
> Chronic *[illegible]* pain
> *[illegible]*
> *[illegible]*
> Hydrocodone *[illegible dose]*

That is the entire medical record (Tr. at 122).

On March 3, 2006, Dr. Gracheck wrote:

> Chronic back pain secondary to DJD *[degenerative joint disease]* and lypomas
> *[sic]*
> 7/10/10/24[10]
> Apply for SSI
> Hydrocodone *[illegible dose]*
> Ibuprofen 800 mg test

That is the entire medical record (Tr. at 122).

On March 30, 2006, Dr. Gracheck completed a Medical Source Statement Physical (Tr. at 125-126). Dr. Gracheck found that plaintiff could lift less than five pounds frequently and 15 pounds occasionally; stand or walk for 15 minutes at a time and for a total of two hours per day; sit for 45 minutes at a time

---

[10]I surmise, from reviewing Dr. Gracheck's other records, that this means plaintiff rated his pain a 7/10 and reported pain 10 out of 24 hours each day. However, that is merely a guess.

and for a total of two hours per day; and was limited in his ability to push or pull with hand and/or foot controls. When asked on the check-mark form to specify what limitation plaintiff had, Dr. Gracheck left the line blank.

Dr. Gracheck marked that plaintiff was limited in his ability to see, hear, or speak, but again he left the explanation section blank. He noted that plaintiff could never climb or stoop, but that he could occasionally balance, bend, kneel, crouch, crawl, reach, handle, finger, feel or grip. He noted that plaintiff should avoid any exposure to heights; moderate exposure to extreme temperature, dust, fumes, vibrations and hazards; and concentrated exposure to wetness or humidity.

The form asked if plaintiff needs to lie down or recline to alleviate pain or fatigue. Dr. Gracheck checked "yes" and wrote 1 to 3 times per day for 30 minutes to two hours at a time. When asked for the objective basis for his findings, Dr. Gracheck checked "personal exam(s) of patient by this source", "nature of patient's diagnosed impairments", "review of medical records from other sources", and "credible subjective complaints of the patient." In the comments section, Dr. Gracheck wrote, "Unable to continue employment as laborer."

On April 20, 2006, Dr. Gracheck wrote, "multiple lypomas, also DJD c[ervical] spine" (Tr. at 121). He prescribed an

illegible medication.  That is the entire medical record.

On May 8, 2006, plaintiff saw Michael Crim, D.O., to establish care (Tr. at 203).

> He reports being disabled secondary to back pain and has been treated by Dr. Gracheck in Belton, MO for this.  When I asked him about the evaluation that has been done up to this point, the patient reports little to no evaluation.  This is surprising in that it would be difficult to determine whether or not his back pain is chronic or just subacute in nature.  Evidently he may have had an x-ray.  He does not report any radicular symptoms or anything to suggest a neuropathic origin.  No saddle anesthesia, no bowel or bladder incontinence.  No radiation down the legs.  In fact, he feels the source of his pain is multiple tumors that he has on his back and side and he feels these are likely present in the abdominal region.

Upon examination, plaintiff had a mild reduction in range of motion at the hip with flexion and extension, but overall was fairly intact.  Plaintiff's muscle strength was normal globally; his straight leg raising tests were negative.  Dr. Crim noted that plaintiff was insistent that the fatty tumors or lipomas on his back were causing his pain; Dr. Crim explained to plaintiff that the lipomas were most likely unrelated to his back pain. "We will attempt to obtain records from Dr. Gracheck to see what [type] of evaluation has been done to present.  Patient given refill on his back pain medication as he is on a fairly significant amount of Hydrocodone from Dr. Gracheck for this problem.  We will refill it this one time pending receipt of documentation that would warrant continuation of this type of

medication."

Plaintiff told Dr. Crim he wanted a referral to a surgeon
for removal of the lipomas; therefore, Dr. Crim referred
plaintiff to Dwight Wagenknecht, D.O., who saw plaintiff on May
11, 2006 (Tr. 202).  Plaintiff told Dr. Wagenknecht about his
fall in 1992 and said "they wanted to do surgery" due to his
facial fractures, but he refused.  Plaintiff was alert and
oriented times three; he had good hearing.  Dr. Wagenknecht
observed five lipomas on plaintiff's back, ranging from 1.5 cm to
4 cm; all nontender to palpation.  "[R]ecommended he undergo
excision of the lipomas. . . .  I told him I don't think there is
a relationship between the lipomas and his back pain, headache or
numbness in his legs.  However, the patient still insists he
believes this is part of the problem.  I did recommend he undergo
removal of the lipomas."

On May 23, 2006, plaintiff saw Randy Noble, Psy.D., for a
diagnostic exam (Tr. at 187-189).  Plaintiff was taking
Amitriptyline for sleep and Hydrocodone for pain.  He was not
taking anything to treat depression.  Plaintiff reported that his
psychiatric symptoms had begun one week ago and included
decreased sleep, suicidal ideation, crying episodes, loss of
appetite, mood swings, decreased energy, hopelessness,
worthlessness, low frustration tolerance, and paranoia.

Plaintiff rated his depression a 5 to 6 on a scale of 1 to 10.

Dr. Noble noted that plaintiff was oriented in all spheres. Plaintiff claimed he could not remember names or numbers; therefore, Dr. Noble found an impairment in short term and immediate recall. Long term memory was intact as plaintiff could recall his past history. "Diagnostic Exam interview reveals a depressive mood. There were not signs of a suicidal disorder. Orientation was within normal limits." Dr. Noble assessed major depression recurrent, mild. His current GAF was 30[11] with a past-year GAF of 40.[12]

Dr. Crim saw plaintiff again on May 25, 2006, and noted his belief that plaintiff was taking an unnecessarily high dosage of pain medication (Tr. at 201). Dr. Crim again noted that plaintiff had no radicular symptoms. Plaintiff followed up with Dr. Crim about two weeks later, on June 6, 2006 (Tr. at 200). Plaintiff indicated his belief that his back pain is disabling.

---

[11]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[12]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

> I have received some records from Dr. Gracheck. However,
> there is no accompanying imaging studies and they really do
> not provide a lot of information other than what we already
> know. His radiograph of the lumbosacral spine reveals mild
> degenerative spondylosis but otherwise no other abnormality.
> His clinical syndrome continues to be without evidence of
> neurologic compromise or any radiculopathy, so I am hesitant
> to have an MRI done.

On exam, plaintiff's lumbosacral spine reveals no

significant tenderness. Straight leg raising tests were

negative. Dr. Crim gave plaintiff some exercises and stretches

to do for his back and hamstrings. He told plaintiff that he

would not continue to prescribe Hydrocodone at the current level

as prescribed by Dr. Gracheck because "my evaluation and workup

to date d[id] not reveal any good reason for [plaintiff] to be

taking so much medication" (Tr. 200). Dr. Crim noted that the

radiograph of the lumbosacral spine revealed mild degenerative

spondylosis but otherwise no abnormality (Tr. 200).

On May 31, 2006, plaintiff saw Dr. Noble for one hour of

individual psychotherapy (Tr. at 189). "His mood remains

severely dysphoric. He continues to complain of chronic

headaches, depression as well as numerous psychosocial stressors

including lack of ability to work, financial stressors and

social/interpersonal problems. . . . In addition, work with the

patient to assist in coordination of services so that he be be

*[sic]* continued on his pain medication without the possibility of

cessation producing withdrawal."

On June 13, 2006, plaintiff saw William Turner, M.D. (Tr. at 199). Regarding his lipomas,

> The patient states they are causing back pain. I informed him they were not causing back pain and were not related to it. This should not keep him from having a job. The patient stumbled around when I asked him why he didn't have a job and he said it was because of back pain. I said it wasn't due to this and he should have a job. There is no reason why this gentleman shouldn't have a job and pay taxes like the rest of us. I told him we could cut off one of the lesions in his lower back and analyze it and make sure it is a lipoma and see what it is. He said he has had these lesions for many years and they are unchanged and he didn't see any reason to take them off.

That same day, Dr. Turner "with Dr. Crim's approval" wrote a letter to the division of Family Services (Tr. at 199). "Because of this back pain, he claims he can't work. This is an absolute falsehood. The patient should be working and paying taxes like the rest of us. He has seen Dr. Crim and Dr. Wagenknecht as well as myself. I don't see any reason why he can't be working."

On June 29, 2006, plaintiff saw Dr. Noble for one hour of therapy (Tr. at 189). "His mood remains mildly dysphoric. He has recently benefitted from the antidepressant medication prescribed to him by his physician. In addition he has also had medication prescribed for pain management. . . . The therapist provides him with supportive, reality based as was [sic] psychoeducational procedures to increase his awareness as to coping skills for his problems. However, his level of intellectual ability prohibits a significant assignment of

18

reading and or bibliotherapy."

On July 10, 2006, Dr. Turner removed a mole from plaintiff's
ear and one lipoma from his right flank (Tr. at 197). "I did
show it to the patient. He still thinks the pain is being caused
by the lipomas on his back. I told him I doubt it was but we
will see how this does with this one excised." On July 24, 2006,
when plaintiff returned for removal of the sutures, he told Dr.
Turner that removing the lipoma relieved a lot of pressure from
his back (Tr. at 196). Plaintiff brought an MRI which Dr. Turner
reviewed; "they look normal to me."

On July 18, 2006, plaintiff saw Dr. Noble for one hour of
psychotherapy (Tr. at 186). "[W]e continue to address issues out
[sic] economic hardship, psychosocial stressors of no outside
activities as well as his pending disability."

On July 31, 2006, plaintiff saw Dr. Noble for 30 minutes of
psychotherapy (Tr. at 186). "He continues to be disabled and
awaiting decision on his ability to be determined unable to work.
He continues to be presenting as borderline intellectually".

On August 17, 2006, plaintiff saw Dr. Noble for one hour of
psychotherapy (Tr. at 185). Dr. Noble questioned whether
plaintiff's "slow cognitive processes" may be the result of a
brain injury or low intellectual capacity. This was plaintiff's
last treatment appointment with Dr. Noble.

On September 5, 2006, plaintiff saw Randall Booth, M.D., at the Nevada Regional Medical Center Pain Clinic (Tr. at 164). According to these records, plaintiff was taking Amitriptyline *[antidepressant also used to treat insomnia]*, Hydrocodone *[narcotic]*, Cymbalta *[antidepressant also used to treat pain]*, Zocor *[treats high cholesterol]*, and blood pressure medicine. Dr. Booth wrote that plaintiff "may have some depression and mood swings at times, nothing admitted at this time. No other problems listed." Dr. Booth assessed bilateral lumbar radiculopathy and gave plaintiff a lumbar epidural steroid injection.

On September 28, 2006, plaintiff returned to the Pain Clinic for a follow up (Tr. at 165). "he was supposed to follow up with us but had something else going on and he did not come. He is back in today. I am just having a hard time figuring this guy out. He has got pain up about the area of thoracic 8 on the right side, consistent with a trigger point in the right paraspinalis muscle group. We did an epidural steroid injection on him last time and he has pain from the area of a lipoma excision. I asked him if he is feeling any better and he does not know for sure so I am also having equal trouble." Dr. Booth recommended an epidural steroid injection at the thoracic 8 level and plaintiff agreed. Dr. Booth performed the injection that

day.

On October 3, 2006, plaintiff underwent an MRI scan of his thoracic spine (Tr. at 162). The scan revealed early degenerative change with minimal bulging of multiple thoracic intervertebral discs (Tr. at 162). X-rays of plaintiff's thoracic spine taken the same day showed early degenerative changes of the spine (Tr. at 163).

On October 10, 2006, plaintiff saw Dr. Booth at the Pain Clinic and said that the second epidural steroid injection "helped again" (Tr. at 154). Dr. Booth referenced an MRI of plaintiff's thoracic spine "that does reveal some bulging disks in the area of his low thoracic spine" (Tr. at 179). Dr. Booth performed an epidural steroid injection at T7. Plaintiff reported that his pain level was 3 on a scale of 10 following the procedure (Tr. at 155).

An October 30, 2006, an MRI scan of plaintiff's cervical spine showed early degenerative changes of the lower cervical intervertebral discs (Tr. at 152). X-rays of plaintiff's cervical spine taken the same day indicated straightening of the usual lordotic curvature (Tr. at 153).

On December 8, 2006, Ted Moore, M.D., performed a cranial computed tomography (CT) scan to assess plaintiff's complaints of chronic headache and dizziness (Tr. at 149). The CT scan was

normal.

After slipping on the ice in his driveway, plaintiff visited the emergency room on January 17, 2007, complaining of back pain (Tr. at 139-46). X-rays of his lumbar spine were unremarkable (Tr. at 144). The doctor assessed lumbar muscle strain; plaintiff was given pain medication (Vicodin, a narcotic) and released (Tr. at 146).

On January 23, 2007, plaintiff saw Dr. Gracheck and reported that he had fallen on his back (Tr. at 234). There are three illegible words, and then Dr. Gracheck indicated that he prescribed Cymbalta and some other illegible medication.

On March 1, 2007, plaintiff saw Dr. Gracheck who wrote degenerative joint disease, but the other two or three words of the record are illegible (Tr. at 234). He prescribed Hydrocodone and the same illegible medication he prescribed on January 23, 2007.

On May 24, 2007, plaintiff failed to show for his appointment with Dr. Gracheck (Tr. at 234).

On July 23, 2007, plaintiff saw Dr. Gracheck who wrote three or four illegible words and prescribed Hydrocodone (Tr. at 234). That same day, Dr. Gracheck completed a Medical Source Statement Physical (Tr. at 128-133). The major diagnoses were listed as degenerative joint disease and degenerative disc disease of the

cervical, dorsal and lumbar spine with chronic pain, chronic depression with chronic fatigue syndrome, and chronic myositis *[inflammation of the skeletal muscles]* with a guarded prognosis. The form asks if the patient is a malingerer, and Dr. Gracheck checked "no." He did note that emotional or psychological factors contribute to the patient's symptoms and limitations and listed those as anxiety and depression. To the question "How often in a typical workday is your patient's experience of symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks?" Dr. Gracheck checked "frequently." He wrote that plaintiff was "capable of low stress jobs only." He wrote that plaintiff could walk two city blocks before needing to stop and rest; that he could sit for one hour at a time and for less than two hours total all day; and stand for two hours at a time. When asked how long plaintiff could stand or walk total all day, Dr. Gracheck left it blank. He noted that plaintiff needs a job that permits him to change positions at will. He said plaintiff needs to lie down or recline every two hours to alleviate pain, fatigue or other symptoms. He marked that plaintiff can occasionally lift ten pounds but cannot frequently lift any weight ("less than ten pounds" was a choice, but Dr. Gracheck did not select even that option). He noted that plaintiff can rarely twist, stoop, bend,

kneel, crouch, squat, crawl, climb ladders or climb stairs; but that plaintiff can occasionally reach, handle, grip, finger, or feel.  When asked if plaintiff's impairments were likely to produce good days and bad days, he checked "yes" and he checked "more than 4 days per month" when asked how many days plaintiff is likely to be absent from work as a result of his symptoms or required treatment.  Finally, when asked to check all of the factors upon which he relied, Dr. Gracheck checked all but one, with the one unchecked factor being "treating relationship with patient".  He checked personal exam(s) of patient, review of your records for patient, review of records from other sources, specific clinical test results, credible subjective reports of patient, and general nature and seriousness of the patient's specific medical diagnoses.

On July 31, 2007, Dr. Noble, plaintiff's former psychotherapist, completed a Medical Source Statement Mental (Tr. at 181-184).  Dr. Noble listed major depression as his diagnosis and indicated that plaintiff's prognosis is guarded.  He found that plaintiff was markedly limited in the following:

- The ability to remember locations and work-like procedures
- The ability to carry out detailed instructions

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember very short and simple instructions

24

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

He found that plaintiff was mildly limited in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff had no limitation in the following:

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

Dr. Noble indicated that plaintiff's impairment had already or was expected to last at least 12 months; that plaintiff was not a malingerer; that plaintiff would have good days and bad days; that plaintiff would be likely to miss work four or more days per month; and that he relied on his personal exam of plaintiff, his treating relationship with plaintiff, and credible subjective reports of plaintiff to reach his opinion. He concluded with "Pt has moderate depression and evidences impairment secondary to low IQ or head injury."

On August 27, 2007, plaintiff saw Dr. Gracheck for chronic pain "24/7 7/10" meaning 24 hours a day, 7 days a week, rated a 7 out of a scale of 1 to 10 (Tr. at 234). He assessed degenerative joint disease and degenerative disc disease and prescribed hydrocodone.

On September 24, 2007, plaintiff saw Dr. Gracheck for chronic pain, again 24/7 and rated a 7/10. Dr. Gracheck prescribed hydrocodone.

On October 22, 2007, plaintiff saw Dr. Gracheck for chronic pain (Tr. at 235). He prescribed hydrocodone and amitriptyline.

On November 14, 2007, plaintiff saw Dr. Gracheck who wrote two or three illegible words and prescribed hydrocodone and clonazepam, which treats panic disorder (Tr. at 235).

On January 2, 2008, plaintiff saw Dr. Gracheck who wrote three illegible words and then prescribed hydrocodone and clonazepam (Tr. at 235).

On January 21, 2008, Dr. Gracheck completed another Medical Source Statement Physical (Tr. at 209-214). He found plaintiff's prognosis was guarded, although he left blank the section asking for the major diagnoses. He noted that plaintiff is not a malingerer and that emotional or psychological factors do not contribute to plaintiff's symptoms and limitations. Despite marking "no" to the above, Dr. Gracheck checked depression and anxiety when asked to identify any psychological conditions affecting or contributing to plaintiff's condition. He checked "frequently" when asked how often plaintiff's symptoms would be severe enough to interfere with the attention and concentration needed to perform even simple work tasks. He marked that plaintiff was capable of performing only low stress jobs, that he could walk one to two city blocks at a time, could stand for 30 minutes at a time, could stand or walk a maximum of less than two hours per day, could sit for one hour at a time and for less than two hours per day, and would need to change

positions at will. Dr. Gracheck wrote that plaintiff would need to lie down, recline, or elevate his feet three to four times per day to alleviate pain, fatigue, or other symptoms. He found that plaintiff could rarely lift less than ten pounds; could rarely twist; and could never stoop, bend, kneel, crouch, squat, crawl, climb ladders, or climb stairs. He found that plaintiff could occasionally reach, handle, grip, finger or feel; that he would have good days and bad; and that he was likely to miss more than four days of work per month from his symptoms and treatment. Dr. Gracheck was asked to check all of the factors upon which he relied in making his finding, and he checked every one of them: personal exam(s) of the patient, treating relationship with the patient, review of your records for patient, review of records from other sources, specific clinical test results, credible subjective reports of patient, and general nature and seriousness of the patient's specific medical diagnosis.

Ten days later, on January 31, 2008, Dr. Gracheck completed yet another Medical Source Statement Physical[13] (Tr. at 286-291). This time he included a diagnosis: "closed head trauma with

---

[13]Although it was completed prior to the administrative hearing and pre-dates Dr. Gracheck's March 19, 2008, Medical Source Statement Physical which was submitted to the ALJ, Dr. Gracheck's January 31, 2008, Medical Source Statement was not submitted to the ALJ. Rather, it was later submitted to the Appeals Council by plaintiff's counsel, which considered it in denying plaintiff's request for review (Tr. at 4-8).

cognitive dysfunction, degenerative joint disease, degenerative disc disease of cervical, dorsal, lumbosacral spine and chronic constant pain secondary to injuries, chronic anxiety and depression secondary to chronic constant pain, chronic insomnia secondary to pain resulting in chronic fatigue." Plaintiff's prognosis was guarded. Although ten days earlier, plaintiff's symptoms interfered "frequently" with his attention and concentration, by this day they interfered "constantly" with plaintiff's attention and concentration. Plaintiff's need to lie down, recline or elevate his feet was every two hours for 30 minutes. Whereas before he could "never" lift ten pounds, this day he was able to lift ten pounds "rarely." Ten days earlier he could rarely twist, but this day he could "never" twist. The rest of the form was the same as the form he completed ten days earlier.

Dr. Gracheck completed yet another Medical Source Statement Physical two and a half months later on March 19, 2008 (Tr. at 227-232). His need to lie down, recline, or elevate his feet was every hour for 15 minutes. He could rarely lift less than ten pounds and never lift anything else. He could never twist, stoop, bend, kneel, crouch, squat, crawl, climb ladders or climb stairs; his ability to reach, handle, grip, finger or feel had decreased from occasionally to rarely as to all functions.

On April 23, 2008, plaintiff was examined by Lindsey Brooks, Psy.D., at the request of plaintiff's counsel (Tr. at 245-249). Plaintiff reported having suffered a series of head injuries throughout his life, although none of these had been mentioned by plaintiff when being treated for the 1992 fall. First, he said he suffered a head injury in second grade during which he was unconscious for a few minutes and lost his vision for the day. Next, he was in a bicycle accident at age 11 or 12, hit the back of his head, and was unconscious for around 30 minutes. He suffered from amnesia and "sort of went crazy" but was not able to elaborate on what he meant by "went crazy." When he was 17, he suffered a head injury during a fistfight. On that occasion he was knocked unconscious for ten minutes and thereafter had memory problems. He was trimming a tree at age 21 and suffered a head injury but did not lose consciousness that time, but he did have a lot of neck pain. A year or two later, he fell into a basement while working construction, he landed on his face, and he was knocked unconscious for 15 or 20 minutes (although the witnesses to that fall indicated it was a minute or two). Finally, plaintiff fell down stairs at age 27, fell on his head, and was knocked unconscious for less than a minute. This fall resulted in tumors on his back, according to plaintiff.

Plaintiff described suffering from depression since his head injury at age 22 or 23 when he fell into the basement.[14] Although he described having thoughts of self-harm,[15] he refused to answer when asked whether he had any intention of following through on those thoughts.  When describing his past, plaintiff said that "maybe to some extent" there was sexual abuse, but he said he did not want to discuss it.  This is despite plaintiff having denied sexual abuse to Holly Chatain, Psy.D. (Tr. at 99). Plaintiff recounted his employment history, indicating that he had left all but one job for reasons other than his impairments. Plaintiff described therapy with Dr. Noble as "kind of helpful" and said that Cymbalta helped but he had to stop taking it because he could not afford it.

Plaintiff reported back pain, knee pain, headaches, neck pain, multiple bulging discs in his spine, several tumors on his back that are pressing on his nerves, high blood pressure, and borderline chronic obstructive pulmonary disease.  He was taking hydrocodone and clonazepam.

---

[14]This contradicts his statement to Dr. Booth on September 5, 2006, when he denied suffering from depression and his statement to Dr. Noble on May 23, 2006, when he said his depression had started a week earlier.

[15]Dr. Noble had found no signs of a suicidal disorder, and Dr. Chatain noted no history of suicidal thoughts.

Dr. Brooks observed that plaintiff was neat, clean, and appropriately dressed.  Facial expressions were appropriate and eye contact was adequate.  He demonstrated an appropriate range of affect.  After performing the Wechsler Adult Intelligence Scale-III and the MMPI-2, Dr. Brooks wrote, "The validity indices of this profile indicate the [sic] this profile is likely invalid, as the client appears in [sic] have answered in an effort to exaggerate his problems, to create the impression of a severe emotional disturbance.  Therefore, the clinical elevations will not be interpreted.  This response pattern may be seen as a cry for help, as the client reported many serious symptoms of depression in the clinical interview."

Dr. Brooks assessed major depressive disorder moderate, recurrent, without psychotic features.  She also assessed attention deficit hyperactivity disorder and borderline intellectual functioning.  Plaintiff's GAF was 50.[16]  She concluded with:

> Mr. Spurlock's emotional disturbance is of the severity and
> magnitude sufficient enough to interfere with his ability to
> consistently perform daily tasks, and preclude him from
> performing an occupation.  Mr. Spurlock also has cognitive
> deficits which would inhibit him from being able to perform
> consistently in many occupational settings.  His overall IQ

------

[16]A global assessment of functioning of 41 to 50 means
serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) or any serious impairment in
social, occupational, or school functioning (e.g., no friends,
unable to keep a job).

score and most IQ indices fell into the Borderline range of functioning, which is significantly below average. One index actually fell into the Extremely Low range of functioning, which suggests that Mr. Spurlock may have significant problems with concentration and attention. It is strongly recommended that Mr. Spurlock begin medication management for his depression, as well as participate in weekly individual psychotherapy.

The following day, on April 24, 2008, Dr. Brooks completed a Medical Source Statement Mental (Tr. at 241-244). She found that plaintiff was markedly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

She found that plaintiff was moderately limited in the following:

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was mildly limited in the following:

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

She indicated that plaintiff was not a malingerer, that he would have good days and bad days, that he was likely to miss more than four days of work per month due to his symptoms and treatment, and that in order to reach these conclusions she relied on her personal exam of plaintiff, review of her records for plaintiff, specific clinical test results, general nature and seriousness of plaintiff's specific medical diagnoses, review of records from other sources, and credible subjective reports of

the plaintiff.

On August 14, 2009, plaintiff had several lipomas removed from his back and one from his abdominal wall (Tr. at 262-266). The record reflects that, "He has had a bulging disc in the past operated;" however, there is no evidence that plaintiff ever had surgery on a bulging disc. Plaintiff reported taking Valium every day and Vicodin for pain. The lipomas showed no evidence of abnormality or malignancy.

## C.    *SUMMARY OF TESTIMONY*

During the April 15, 2008, hearing, the following individuals testified:  plaintiff, medical expert John Morse, and vocational expert Nelly Katsell.

## 1.    **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 40 years of age (Tr. at 301). He has an 11th grade education (Tr. at 301). Plaintiff lived with his mother (Tr. at 316). Plaintiff tries to do his own laundry and he tries to help out with a little bit of yard work (Tr. at 317). He can drive but he does not have a car (Tr. at 317). Because his mother does not have a car either, he gets around by taxi or his aunt may give him a ride (Tr. at 317).

Plaintiff's last job was packing and assembly at Thorco where he assembled and packed desks (Tr. at 302). For most of the day he stood on a concrete floor (Tr. at 302). He quit after

a month due to his back (Tr. at 302).  Before that he worked for three years at O'Sullivan's Furniture in the warehouse or packing (Tr. at 302-303).  All of plaintiff's jobs required him to lift at least ten pounds (Tr. at 304).

Plaintiff believes he cannot work because of his back pain which results in headaches (Tr. at 305).  At his last job, he would have to lie down during his breaks (Tr. at 305).  When asked why he thinks he cannot do even a light job, plaintiff said, "Not permanently, I don't think so.  Just due to my health, you know, and the pain." (Tr. at 306).  When asked why he could not do a job that requires sitting most of the day, but would allow him to stand up whenever he wanted, he said his headaches would interfere with a job like that (Tr. at 307).  Plaintiff's attorney acknowledged that plaintiff has never been diagnosed with migraines (Tr. at 307-308).  When asked what he does when he gets a headache, plaintiff said, "Well, sometimes I used to take Tylenol but, you know, I feel that I don't want to pollute my body with too many more medicines." (Tr. at 308).  Plaintiff said lying down and rubbing his forehead will give him relief, and he believes hydrocodone helps with his headaches (Tr. at 308).  Plaintiff takes one hot shower and three or four hydrocodones per day to help with his pain (Tr. at 309).  When asked again why he could not perform such a job (i.e., requiring mostly sitting but

being able to stand at will), plaintiff said he could not do that job because "If I could I would be doing it" (Tr. at 311-A).

Plaintiff testified that he has had four "outpatient surgeries of, injections of some, something, some kind of injections." (Tr. at 310). Plaintiff testified that one of the trigger point injections helped for a little bit, but "the other one in the middle of my back really, really, really hurt me bad." (Tr. at 310). Plaintiff lies down on a heating pad for temporary relief of back pain (Tr. at 310-311). Plaintiff wears a back brace and a knee brace (Tr. at 311). No doctor prescribed the braces; plaintiff just thought they might help (Tr. at 311).

Plaintiff can sit for 30 minutes but then needs to stand up or lean back and stretch, both of which help (Tr. at 306).

Plaintiff fell at a construction site in 1992 and broke the floor of his eye and the bridge of his nose, knocked some teeth loose, and broke three bones in the side of his head (Tr. at 312). He never had surgery because of these injuries, but it was suggested (Tr. at 312). After this fall, plaintiff experienced increased memory problems, worse balance, and increased difficulty sleeping (Tr. at 314-315). Plaintiff's inability to sleep well causes him to be fatigued during the day (Tr. at 315).

Plaintiff suffers from depression because of not being able to do much, and the anxiety came along due to stress (Tr. at 315-

316).  Plaintiff does not have Medicaid or insurance (Tr. at
316).

## 2.  **Medical expert testimony.**

Medical expert John Morse, M.D., testified at the request of
the Administrative Law Judge.  Dr. Morse testified that plaintiff
had head trauma in 1992 but that surgery was not required and
there was no specific neurological deficit documented in the
record as a result of that accident (Tr. at 318).  The source of
plaintiff's back pain is not clear - x-rays in December 2005,
June 2006, and January 2007 are all negative (Tr. at 318).  A
cervical spine MRI in October of 2006 shows minimal degenerative
changes (Tr. at 318).  A CT of his head in December 2006 is
negative (Tr. at 318).  An MRI of his thoracic spine in October
2006 shows mild degenerative changes without significance or
impingement (Tr. at 319).  An exam in June 2005 was negative (Tr.
at 319).  A neurologic exam at the same time resulted in no
specific objective findings (Tr. at 319).  In June 2006, no
objective findings of any neurological deficit were made, and no
further studies were ordered (Tr. at 319).

Dr. Morse found "inconceivable" the allegation that
plaintiff's headaches are caused by his 1992 fall -- "Usually you
either get better or you don't.  But 15 years later you cannot,
one cannot ascribe symptoms to an injury that far back without

having any, one could consider increased intracranial pressure, but we should see that, something either on exam or on imaging to substantiate that. I would think the headaches could be simple tension headaches from any number of causes. But I don't have anything in the records to suggest that they're migraine or that they're causally connected to the old head injury this many years later." (Tr. at 319-320).

Based on the record, Dr. Morse testified that plaintiff should be able to lift 25 pounds frequently and 50 pounds occasionally, sit for six hours per day, and stand and walk for six hours per day (Tr. at 320).

### 3. Vocational expert testimony.

Vocational expert Nelly Katsell testified at the request of the Administrative Law Judge. The vocational expert testified that a person with the limitations described by Dr. Noble in his Medical Source Statement Mental would be able to work as a garment folder, DOT 789.687-066, with 450 in the surrounding area and 699,000 in the country (Tr. at 327) or a garment bagger, DOT 920.687-018, with 4,300 in the area and 210,000 in the country (Tr. at 328). Both jobs are light (Tr. at 328).

The vocational expert testified that anyone who would miss more than four days of work per month could not work (Tr. at 328).

The next hypothetical incorporated the restrictions listed by Dr. Gracheck in his July 23, 2007, Medical Source Statement found at Tr. at 128-133 (Tr. at 328). The vocational expert testified that such a person could not work due to the requirement that he lie down every two hours for an unknown duration and that he miss more than four days of work per month (Tr. at 328-329).

If the person had mild limitations in restrictions of activities of daily living and no other mental limitations, the person could still do the jobs already identified in the first hypothetical (Tr. at 329).

The next hypothetical involved the limitations found by Dr. Subramanian (Tr. at 329). The vocational expert testified that such a person could do light jobs such as a small products assembler, DOT 706.684-022, with 3,000 jobs in the area and 750,000 in the country (Tr. at 330), or a linen grader, DOT 361.687-022, with 2,700 in the area and 300,000 in the country (Tr. at 330).

The next hypothetical involved the residual functional capacity as found by medical expert Dr. Morse (Tr. at 330). The vocational expert testified that such a person could be a laundry worker, DOT 361.684-014, with 1,000 jobs in the area and 204,000 in the country; a packager, DOT 930.587-018, with 2,300 jobs in

the area and 567,000 in the country; or a floor waxer, DOT 381.687-032, with 2,700 jobs in the area and 460,000 in the country (Tr. at 330-331). All of the jobs named by the vocational expert are unskilled, simple and repetitive (Tr. at 331).

The vocational expert testified that a person with the ability to perform sedentary jobs with an SVP of 2, could work as a cutter/paster, DOT 249.587-014, with 1,300 in the area and 100,000 in the country, or an ink bencher, DOT 652.685-038, with 700 jobs in the area and 410,000 in the country (Tr. at 339).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Eve Godfrey entered her opinion on May 27, 2008 (Tr. at 13-25). The ALJ found that plaintiff's insured status expired on March 31, 2010 (Tr. at 15).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 15). His $1,556.80 earnings in 2005 does not amount to substantial gainful activity.

Step two. Plaintiff suffers from degenerative disc disease and dysthymia, severe impairments (Tr. at 15).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

Step four. Plaintiff has the residual functional capacity to perform light work except he is limited to simple one- and

two-step work (Tr. at 18).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 23).

Step five.  Plaintiff can be a garment folder or a bagger, both available in significant numbers in the national and regional economies (Tr. at 24).

## VI.  *OPINIONS OF TREATING PHYSICIAN AND PSYCHOLOGIST*

Plaintiff first argues that the ALJ erred in failing to give controlling weight to the opinions of Dr. Gracheck and Dr. Nobel, both of whom indicated that plaintiff would be likely to miss more than four days of work per month due to his symptoms and treatment.  Dr. Gracheck also indicated that plaintiff's symptoms would constantly interfere with his attention and concentration. He also argues that the ALJ should have given controlling weight to the opinion of Dr. Chatain who found that plaintiff's psychological functioning is impaired due to "mild" chronic depression.  Finally Dr. Brooks, who examined plaintiff at his attorney's request, found that plaintiff would miss more than four days of work per month and was markedly limited in his ability to understand and remember short and simple instructions and maintain attention and concentration for extended periods.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial

evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) – (5).

*Dr. Gracheck*:  Dr. Gracheck had an extended treatment relationship with plaintiff, he saw plaintiff approximately once a month although there were periods of many months in between visits, and he treated plaintiff for his back pain.  However, Dr. Gracheck's opinions in his Medical Source Statements are not supported by any medical signs or laboratory findings, they are not consistent with the record as a whole, and he is not a specialist.

Dr. Gracheck's own medical records are probably the most bareboned I have ever seen.  He did not list plaintiff's

subjective symptoms.  He did not list any observations.  He did not perform exams.  He did not perform any tests.  Many times he did not even make any assessments.  He merely prescribed what several other doctors believed to be extremely excessive dosages of narcotic medication without any medical basis for those prescriptions.  When plaintiff was asked by Dr. Crim what evaluations Dr. Gracheck had done, plaintiff could not come up with any.  Dr. Gracheck's multiple Medical Source Statements, although generally consistent, became progressively more restrictive, sometimes without him having seen plaintiff for any medical appointment from one MSS to the next.  His finding regarding plaintiff's need to lie down or recline is not supported by so much as a subjective complaint in his records much less a finding.  He never recommended to plaintiff that he lie down or recline for pain relief, and plaintiff never told any doctor that lying down or reclining helped with his pain.  Dr. Gracheck even indicated that plaintiff was limited in his ability to see, hear, and speak; yet, the only mention in the record of plaintiff's ability to hear or see was a finding by Dr. Subramanian that plaintiff's vision (with glasses) and hearing were normal.

The medical signs and laboratory findings by other doctors are not consistent with the opinion of Dr. Gracheck.  There was

no neurological deficit documented in the record as a result of plaintiff's work accident. X-ray in December 2005 were normal. X-rays in June 2006 were normal. X-rays in January 2007 were normal. An MRI in October 2006 showed only minimal degenerative changes of the cervical spine. A head CT scan in December 2006 was normal. An MRI of his thoracic spine in October 2006 showed only mild degenerative changes. Dr. Crim believed that there was no good reason for plaintiff to be on the narcotic pain medication prescribed by Dr. Gracheck. Dr. Turner believed that it was an "absolute falsehood" that plaintiff was unable to work due to his alleged symptoms.

An ALJ may properly discount a medical source statement where the physician's opinion was "without explanation or support from clinical findings" and "not internally consistent with [his] own treatment notations." Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004).

This is the ALJ's analysis of Dr. Gracheck's opinions:

The opinions of this doctor also appear on a fill-in-the-blank form, with only marginal notes attached to them. The doctor also failed to cite any medical testing results or objective observations to support his conclusions as to the claimant's residual functional capacity. Furthermore, the opinion of this doctor, who assessed the claimant with the residual functional capacity of less than sedentary work is not afforded any significant weight as this opinion conflicts with the substantial evidence of record, including the objective medical evidence of his other treating and examining physicians, documenting less severe limitations. The claimant's imaging studies did not show any severe

spinal disc degeneration or bony abnormalities, nor any
brain changes.  On May 11, 2006, Dr. Wagenknecht reported
that there was no relation of the claimant's lipomas and his
back pain, headache or numbness in his legs, but the
claimant still insisted that there was a relationship.  M.
Crim, D.O., reported on June 6, 2006, that the claimant's
clinical syndrome continued to be without evidence of
neurological compromise or any radiculopathy and there was
no good reason to be taking so much hydrocodone.  William A.
Turner, M.D., reported on June 13, 2006, that the claimant's
assertion that he could not work because of his back pain
was an absolute falsehood, and that he should be working and
paying taxes like the rest of us.  The claimant was informed
that his lipomas were not causing back pain and were not
related to it and this should not prevent him from having a
job.  The doctor did not adequately consider these objective
medical findings and the findings of other treating
physicians.  The objective evidence in the record does not
support the level of severity that this doctor assigns.

(Tr. at 22-23).

Based on the above, I find that the ALJ was justified in
significantly discounting the opinion of Dr. Gracheck and
adequately explained her reasons in her opinion.

***Dr. Noble***:  Dr. Noble saw plaintiff only for a couple of
months, and that treatment ended a year before Dr. Noble
completed the Medical Source Statement Mental.  He saw plaintiff
for psychotherapy, and he is a specialist as he is a
psychologist.

However, Dr. Noble's opinion is not supported by medical
signs or laboratory findings and it is not consistent with the
record as a whole.

The ALJ had this to say about Dr. Noble's opinion:

[T]he medical source statement opinion appears on a fill-in-
the-blank form, with only marginal notes attached to them.
The doctor failed to cite any medical testing results or
objective observations to support his conclusions as to the
claimant's residual functional capacity.  Furthermore, the
opinions of this doctor, who assessed the claimant with
marked mental impairments and borderline intellectual
functioning are not afforded any significant weight as these
opinions conflict with the substantial evidence of record,
documenting less severe limitations.  The doctor did not
adequately consider the entire record, including the
statements of collateral sources and the objective findings
of other treating physicians.  It is specifically noted that
Dr. Noble reported on June 1, 2006, that the claimant
appeared to be of average intellectual ability.  The
objective evidence in the record does not support the level
of severity that this doctor assigns.  Furthermore,
statements that a claimant is 'disabled', 'unable to work'
can or cannot perform a past job, meets a listing or the
like are not medical opinions but are administrative
findings dispositive of a case, requiring familiarity with
the Regulations and legal standards set forth therein and in
the <u>Dictionary of Occupational Titles</u>.  Such issues are
reserved to the Commissioner.  Moreover, the record does not
support the doctor's opinion that the claimant is incapable
of all work.

(Tr. at 20-21).

Dr. Noble's records reflect that he relied almost

exclusively on plaintiff's subjective statements.  For example,

in the diagnostic exam, he found that plaintiff had an impairment

in short-term memory and immediate recall because plaintiff

claimed to be unable to remember names or numbers.  Dr. Noble's

initial assessment was major depression "mild" which does not

support a GAF assessment of 30 (which means behavior considerably

influenced by delusions or hallucinations, incoherence, suicidal

preoccupation, or an inability to function in almost all areas).
Dr. Noble found <u>no</u> signs of suicidal disorder, not a
preoccupation with suicide.  Plaintiff described symptoms of one-
week's duration which included decreased sleep, crying, loss of
appetite, mood swings, decreased energy, low frustration
tolerance, hopelessness and worthlessness.  Even those alleged
symptoms do not support a finding that plaintiff had an
"inability to function in almost all areas."

Interesting, when plaintiff began his psychotherapy with Dr.
Noble, he had just been told by Dr. Crim that he would not
continue to prescribe the narcotics that Dr. Gracheck prescribed.
Dr. Noble wrote, "work with the patient to assist in coordination
of services so that he [can] be continued on his pain medication
without the possibility of cessation producing withdrawal."

A month later, Dr. Noble noted that plaintiff "has recently
benefitted from the antidepressant medication prescribed to him
by his physician."  However, plaintiff was prescribed
Amitriptyline on June 21, 2005 - more than a year earlier - to
assist with sleep.  There is no evidence that plaintiff had been
prescribed any other antidepressant "recently."

The remainder of Dr. Noble's notes focus on plaintiff's
impending disability benefits decision.  On July 18, 2006, he
noted that they addressed plaintiff's economic hardship and his

pending disability. On July 31, 2006, he "continues to be disabled and awaiting decision on his ability to be determined unable to work."

Dr. Noble initially noted that plaintiff was of average intellectual ability but found in another note that plaintiff had only borderline intellectual ability, with no explanation for this discrepancy. There simply are no supported findings in Dr. Noble's records which would form a basis for his incredibly restrictive Medical Source Statement. Furthermore, Dr. Noble's opinion is limited to the three-month time period when he treated plaintiff; and plaintiff did not receive any other mental health treatment before or after. Therefore, Dr. Noble's opinion does not satisfy the durational requirement for a disabling impairment. The ALJ did not err in discounting that opinion.

***Dr. Chatain***: Plaintiff argues that the ALJ erred in relying on the opinion of Dr. Chatain while ignoring her comment that plaintiff was "severely depressed" and needed to seek treatment. Plaintiff did seek treatment after he saw Dr. Chatain - he participated in psychotherapy with Dr. Noble five or six times the following year. Plaintiff focused on making sure he could continue to get narcotic pain medication and his pending disability case. He did not seek any mental health treatment beyond those few visits, and there is no other evidence that he

49

was significantly impaired in his ability to function as a result.  In any event, a diagnosis of severe depression and a recommendation to seek treatment does not support a finding that plaintiff is disabled due to depression.

***Dr. Brooks***:  Dr. Brooks examined plaintiff on one occasion at the request of plaintiff's counsel.  The ALJ had this to say about Dr. Brooks:

> Dr. Brooks is an examining psychologist.  The opinions of this doctor, who assessed the claimant with marked mental impairments and borderline intellectual functioning, are not afforded any significant weight as these opinions conflict with the substantial evidence of record, documenting less severe limitations.  Dr. Brooks's opinion is made at the request of the claimant's attorney and it is highly surprising that this doctor finds that the claimant exaggerated his mental symptoms, yet finds that he is incapable of performing any work because of his mental symptoms.  In fact, it boggles the mind that this doctor could make such an extreme finding based on blatant deception.  Also there is no MSE which is required by the Social Security disability handbook.  Also noted that consultative examiner Dr. Chatain found that the claimant had the same diagnosis and gave him a GAF of 60.  A GAF of 50 is a serious diagnoses of major depressive disorder, moderate.  It is clear the examination was monopolized by the claimant's physical issues, including his head trauma, which are beyond the expertise of this examiner.  In addition, this psychologist was only licensed to practice seven months prior to examining the claimant.  The doctor did not adequately consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians.  Moreover, the record does not support the doctor's opinion that the claimant is incapable of all work.

(Tr. at 21).

50

Not much needs to be said about this opinion. Dr. Brooks's statement that perhaps plaintiff's lying and exaggeration of his symptoms could have been a cry for help is completely unfounded, especially in light of the fact that he had essentially no mental health treatment to speak of during the entire duration of the records in this case. One cannot simply ignore invalid test results, especially when they are as exaggerated as in this case. The ALJ did not err in discrediting Dr. Brooks's opinion.

The opinions to which plaintiff believes the ALJ should have given controlling weight are based on plaintiff's own significant exaggerations in an attempt to secure disability benefits. Plaintiff rarely sought medical treatment for his impairments other than what has been described as significant doses of narcotic medication. He half-heartedly participated in psychotherapy for a few sessions, discussing predominantly his desire to secure disability benefits, according to the treatment notes. When plaintiff first applied for benefits, he told Dr. Chatain that inadequate finances and being unemployed were his stressors. He said his self esteem was good, his appetite was fine, he had no hallucinations or delusions, no history of mania or hypomania, and no history of suicide attempts; he was on no medication, and he had never sought psychological treatment. Plaintiff was cooperative and completed all tasks, his memory

functioning was fine, he comprehended what was said.  Although she believed he may have exaggerated his symptoms, she did not indicated that it was to an extreme level.

When plaintiff saw Dr. Subramanian, he said he had had major surgery for broken bones in his skull - clearly a lie.  Despite that, plaintiff was observed as having no issues with sitting, standing, handling objects, or traveling.  Thereafter, plaintiff began to claim that his lipomas were causing his pain and he wanted them removed; however, when he told Dr. Turner this, Dr. Turner flat-out disagreed and said there was no reason plaintiff could not work.  Dr. Turner offered to remove the lipomas that plaintiff had up to this point been seeking to have removed - but then plaintiff changed his mind and decided to hold onto the fatty tumors that he claimed were causing him disabling pain, for without those lipomas he really had nothing on which to hang his hat.

Later, plaintiff saw Dr. Brooks for a consultative exam almost two years after he stopped psychotherapy with Dr. Noble.  During this visit, he claimed to have suffered a whole host of head injuries, almost all of which resulted in lengthy periods of unconsciousness - clearly not true.  For the first time he brought up the possibility of a history of sexual abuse, although he had denied that in the past and refused to elaborate.  He

reported "multiple bulging discs" with which he was never assessed, he indicated he had tumors which were pressing on nerves even though he had been told by multiple doctors that was not true, and he said he had borderline chronic obstructive pulmonary disease with which he had never been diagnosed. On his testing, he exaggerated his problems to create the impression of a severe emotional disturbance.

Even in plaintiff's administrative paperwork, there is evidence of his attempt to exaggerate his limitations. On August 23, 2007, in a "Current Medications" form, plaintiff misspelled "depression" as follows: "deprason" (Tr. at 75). However in a "Recent Medical Treatment" form (which is much longer and more complicated) completed in the very same handwriting, plaintiff had no trouble spelling it correctly[17] (Tr. at 77). In one document he was able to spell medications correctly, but in another, he could not even abbreviate it correctly, i.e., "mads" (Tr. at 71, 78). In a Medical Treatment Summary form, plaintiff spelled "tumors" correctly through the document, but then went back and changed two of those references so that the word was misspelled (Tr. at 78).

---

[17]Lest someone make the argument that he was copying a diagnosis and was therefore able to spell it correctly, I note that plaintiff misspelled many other words in this form, and he was able to spell depression correctly in yet other forms on page 78 and 79 of the record.

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the medical opinions discussed above.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ erred in improperly weighing the medical evidence and deriving a residual functional capacity that does not properly take into consideration all of the evidence, i.e., ignoring plaintiff's mental limitations "as identified by plaintiff's treating doctors and psychologists." Specifically plaintiff refers to his doctors' finding that he would need to lie down periodically during the day and that he would miss more than four days of work per month. (Dr. Gracheck's opinion as to both of these factors has already been discussed and was properly discounted.)

An ALJ's RFC finding is based on all record evidence. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) (citing Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); see also 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p. Although the RFC formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty to formulate RFC based on all the relevant, credible evidence of record. Cox v.

<u>Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.") (citing <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001)); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."); <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p. In this case, the ALJ formulated plaintiff's residual functional capacity based on all of the relevant, credible evidence.

Social Security Ruling 96-8p requires that, after identifying an individual's functional limitations, his work-related abilities must be assessed on a function-by-function basis, including physical, mental, and other limitations. Based on her consideration of the entire record, including the medical and non-medical evidence, the ALJ found that plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he was limited to simple, one- and two-step work. When posed with the ALJ's residual functional capacity findings in a hypothetical question that included all of plaintiff's credible impairments, the vocational expert testified that such an individual could perform the representative occupations of garment folder or

garment bagger, each of which constitutes light, unskilled work and exists in significant numbers in the national economy.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 28, 2011